IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

**CHRISTINA MARZIALE; and**                                **PLAINTIFFS**
**DANA McLAIN, Administrator of the**
**Estate of Elaine Marziale**

**V.**                    **CASE NO. 5:18-CV-86-DPM**

**CORRECT CARE SOLUTIONS LLC;**
**MAKITA LAGRANT; STEPHEN**
**COOK; and WELLPATH LLC**                               **DEFENDANTS**

### REPORT WITH RECOMMENDATIONS

**I.**      **Procedure for Filing Objections:**

This Report with recommendations has been sent to Chief Judge D.P. Marshall Jr., the presiding judge in this case. The parties may file objections with Judge Marshall if they disagree with the findings or conclusions set out in the Report. Objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be filed within 14 days, unless Judge Marshall orders otherwise. If parties do not file objections, they risk waiving the right to appeal questions of fact. And, if no objections are filed, Judge Marshall can adopt the recommendations set out in this Report without independently reviewing the record.

**II.**      **Introduction:**

It has been over four years since Plaintiffs Christina Marziale and Dana McLain, Administrator of the Estate of Elaine Marziale, filed their complaint in this matter. In that time, the case has been marred by contentious and protracted discovery. Based on the extensive discovery abuse committed by Defendant Correct Care Solutions LLC n/k/a

Wellpath LLC ("CCS"), this Court previously recommended that CCS be sanctioned and that it be compelled to produce additional documents. (Doc. No. 208) The recommendation was largely adopted by Chief Judge Marshall on August 10, 2020. (Doc. No. 217)

Pursuant to the August 10 order, the parties engaged in limited, additional discovery. During this "clean-up" discovery period, Plaintiffs identified further discovery abuse and moved for additional sanctions against CCS. (Doc. Nos. 263, 285) CCS responded to the motions. (Doc. Nos. 274, 297) For reasons explained below, Plaintiffs' motions for sanctions should be denied in part and granted in part.

### III.   **Background**:

Much of the discovery history in this case was outlined in this Court's July 28, 2020 Report with Recommendations. (Doc. No. 208) The Court will therefore focus its attention on the discovery items most relevant to the instant motions: medical records of pregnant women in CCS care; indemnification agreements; CCS policies and procedures; CQI meeting minutes; mortality/morbidity reviews; and audit trials.

In February 2016, Plaintiffs filed suit against CCS and CCS employees alleging that Ms. Marziale received constitutionally inadequate medical care while she was an inmate at Southeast Arkansas Community Correction Center. (Doc. No. 2)

On March 4, 2019, during the first of many status conferences in this matter, CCS agreed to produce the complete medical records of pregnant inmates in the Arkansas correctional system for 2014 and 2015. (Doc. No. 104 at pp. 102–103) Additionally, CCS counsel told the Court that all discoverable documents, other than quality-assurance and

peer-review documents, had been produced. CCS nevertheless agreed to produce any additional documents that might be found. (Doc. No. 104 at p. 87) Judge Marshall later held that CCS was not entitled to a peer-review privilege and ordered CCS to produce all quality-assurance and peer-review documents. (Doc. No. 83 at p. 2; Doc. No. 132)

In May 2019, Plaintiffs stated their belief that CCS was withholding insurance policies, even though all insurance and indemnity agreements had been requested in discovery. (Doc. No. 131 at p. 9; Doc. No. 200-2 at pp. 4–5) CCS was ordered to supplement its insurance discovery response, if necessary, by June 21, 2019. (Doc. No. 136 at p. 2) CCS did not produce any further insurance documents.

After a dispute regarding the scope of pregnancy records to be produced, the Court allowed some redaction of the medical records but otherwise ordered CCS to produce the entire medical records of the pregnant inmates. (Doc. No. 190) CCS produced the records of 65 women in December of 2019. (Doc. Nos. 131, 187, 191)

On August 10, 2020, Judge Marshall entered an order sanctioning CCS and setting out additional discovery items for CCS to produce. (Doc. No. 217) CCS began producing records to Plaintiffs on a rolling basis. During late August and early September, this Court held a series of status teleconferences to help facilitate the clean-up discovery. (Doc. Nos. 222, 224, 232, 238, 246)

Records turned over by CCS revealed that there were six additional pregnant women for whom the medical records should have been produced. (Doc. No. 224) CCS produced the records once the omission was pointed out by Plaintiffs' counsel. (Doc. No. 274-1 at ¶ 17)

On August 21, the parties agreed that all responsive documents would be produced by August 24; and the Court reduced that agreement to an order. (Doc. Nos. 224, 225) On August 24, CCS moved for extension of time to produce a single document: the Strickland audit trail.[1] (Doc. No. 226) In explaining to the Court why CCS could not timely produce the audit trail, CCS counsel revealed the existence of additional audit trails that had not been produced. (Doc. No. 232; Doc. No. 274 at p. 4) CCS counsel immediately emailed those documents to Plaintiffs (Doc. No. 232), but ultimately was unable to produce the Strickland audit trail. (Doc. No. 236 at ¶ 3)

On August 24, the Regional Vice President for CCS, Dona Gordon, signed an affidavit confirming that all responsive documents had been produced. (Doc. No. 230-2) On September 1, upon further prodding from Plaintiffs' counsel, and upon order of the Court, CCS produced its policies and procedures in effect in 2015. (Doc. No. 231; Doc. No. 274-1 at ¶ 13)

On September 3, the Patient Safety Officer for CCS, Dr. Grady Bazzel, signed an affidavit that, in form, again confirmed that all responsive documents had been produced. (Doc. No. 237 at pp. 1–3) On September 16, again upon further prodding from Plaintiff, and in response to a Court order, CCS produced additional monthly and quarterly CQI meeting minutes. (Doc. No. 247; Doc. No. 274-1 at ¶¶ 1–5)

Throughout the clean-up discovery process, Plaintiffs repeatedly requested mortality/morbidity reviews and indemnification agreements from CCS under the belief

---

[1] In this case, an audit trail is a document that indicates whether data was entered, modified, or deleted in inmate medical records.

that the documents existed and were being withheld. (Doc. No. 238; Doc. No. 240 at ¶ 4; Doc. No. 235 at p. 10; Doc. No. 246). CCS denied the existence of mortality/morbidity reviews; but CCS counsel stated her belief there was an indemnification agreement between CCS and Defendants LaGrant and Cook.

The Court ordered CCS to identify a CCS employee who could state with certainty whether CCS "generated any morbidity or mortality reviews between September of 2015 and March of 2016 and, if so, whether a mortality or morbidity review was generated for either Christina Marziale or infant Elaine." (Doc. No. 239) The Court further ordered CCS to produce its indemnification agreements or, "[i]f no indemnification agreements exist, CCS should so state." (Doc. No. 247 at p. 1).

CCS subsequently confirmed that no indemnification agreement existed; and in a deposition, Dr. Bazzel explained that no morbidity or mortality reports had ever been generated for Ms. Marizale or infant Elaine. (Doc. No. 252 at p. 7; Doc. No. 274-3 at pp. 30–31, 42, 53–54)

## IV.     Recommendations:

### A. Second Motion for Sanctions (Doc. No. 263)

*1. Default Judgment*

After completion of the clean-up discovery period, Plaintiffs filed their second motion for sanctions against CCS. (Doc. No. 263) Plaintiffs' primary request for relief is default judgment. Plaintiffs urge that a default judgment is the only complete remedy for CCS's discovery abuse. They argue that they should have been able to get Ms. Marziale's original complete medical record, a shift change booklet, emails from certain CCS

employees, and a mortality review for Baby Elaine. Plaintiffs speculate that these items would corroborate their theory of the case: "that a CCS nurse received a call at 11:30 p.m., Saturday, October 3, 2015, informing her that Marziale was vomiting blood, and that she failed to check on Marziale, talk to Marziale, call a physician, or call a health care provider." (Doc. No. 263 at p. 3)

As an initial matter, all discovery abuses related to Ms. Marziale's medical records, the shift change booklet, and CCS employee emails has already been addressed. (Doc. Nos. 208, 217) Plaintiffs provide no compelling reason for the Court to revisit those issues. Additionally, there is sufficient evidence for Plaintiffs to try their theory to a jury, namely: testimony of Ms. Marziale, Karen Holcomb, and Defendant Cook, as well as the testimony of nurses and guards working the night that Ms. Marziale went into labor. The credibility of any such testimony is an issue for a jury to decide.

As for the newly uncovered discovery violations, CCS's conduct, even in combination with previous discovery abuses, does not rise to the level of *willful* misconduct, a necessary finding for a court to grant default judgment as a penalty for abusing the discovery process. The sanction of default judgment is appropriate only when there is an order compelling discovery, a *willful* violation of that order, and prejudice to the other party. *Comstock v. UPS Ground Freight, Inc.*, 775 F.3d 990, 992 (8th Cir. 2014) (emphasis added). Default judgment is a drastic sanction and is not favored. *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 936 (8th Cir. 2007) (citing *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1020 (8th Cir. 1999)).

CCS's discovery responses have been haphazard and dilatory. Documents produced have often been incomplete; it has taken Plaintiffs years to get to the bottom of seemingly simple questions, such as the existence of indemnity agreements. And, perhaps most troubling, are the repeated representations by counsel for CCS that all discovery material had been produced when, in fact, those representations were untrue. There are at least four orders that CCS flouted: the Court's order to supplement its response regarding insurance documents (Doc. No. 136); the Court's order to produce *all* medical records of *all* pregnant inmates (Doc. No. 190); the Court's order to produce *all* quality assurance material (Doc. No. 85 at p. 2; Doc. No. 132); and the Court's order to produce *all* clean-up discovery material by August 24, 2020. (Doc. Nos. 217, 225).

In all fairness, the discovery production in this case has been complicated by factors other than CCS's recalcitrance. First and foremost, the facility where Ms. Marziale was incarcerated, Southeast Arkansas Community Correction Center, was closed in June of 2016. (Doc. No. 274-2 at p. 37) Documents that were expected to be uploaded or transferred to the CCS home office in Nashville did not always make the trip. (Doc. No. 274-2 at p. 119) In order to locate certain documents, CCS employees had to travel to the regional office in Arkansas to physically search through boxes and filing cabinets. (Doc. No. 274-2 at p. 100)

Additionally, there appears to have been a breakdown in communication between CCS and its counsel regarding which documents had been produced and what documents CCS was obligated to produce. Ms. Gordan testified that she relied on counsel for CCS to

interpret the Court's orders for her and that she believed CCS was not required to produce certain responsive documents. (Doc. No. 274-2 at pp. 113–118)

During the clean-up discovery status conferences, Plaintiffs posited that CCS had purposefully engaged in a "head in the sand" approach to discovery; in other words, CCS purposefully chose not to look in the right places for the right documents. While the theory is plausible, there simply is not enough record evidence for the Court to reach this conclusion. Although CCS's record-keeping was less than pristine, the testimony shows that multiple CCS employees made efforts to find and produce responsive documents. Given the additional discovery complications and CCS's apparent good faith approach to locating responsive documents, the Court does not find that CCS willfully violated court orders.

That is not to say Plaintiffs have not been prejudiced by CCS's conduct in this matter. Plaintiffs' day in court has been delayed, in part,[2] by CCS's misconduct. Further, CCS's delayed production has caused the need to re-depose some witnesses. See *Nat'l Liberty Corp. v. Wal–Mart Stores, Inc*., 120 F.3d 913, 917 (8th Cir.1997) (The need to retake depositions can be prejudicial). But, at the end of the day, Plaintiffs have received the existing responsive discovery documents; they have been awarded attorneys' fees for the excess work caused by CCS's actions; and, for items not produced, CCS will suffer adverse instructions to the jury.

---

[2] The trial has also been delayed by the COVID-19 pandemic. (Doc. No. 313); see also Administrative Orders Eight & Ten.

*2. Other Sanctions*

As an alternative to default judgment, Plaintiffs suggest a number of other sanctions, including an order striking CCS's affirmative defenses, witnesses, and experts; an order compelling out-of-state CCS personnel to testify in-person at trial; an order that certain facts are established; an order preventing CCS from offering evidence in its defense; and a spoliation instruction.

Plaintiffs specifically ask this Court to take as established that a CCS employee was informed of Ms. Marziale vomiting blood on the evening on October 3, 2015. (Doc. No. 265 at p. 36) Given that this will be an integral issue at trial, deeming it an established fact is tantamount to granting default judgment. Likewise, excluding defense witnesses and experts runs counter to the important public policy of having cases tried on the merits. *Edgar v. Slaughter*, 548 F.2d 770, 772 (8th Cir. 1977).

Plaintiffs further request that out-of-state CCS personnel be required to appear to testify at trial.[3] (Doc. No. 263 at p. 3) Plaintiffs cite no precedent for this proposed sanction, and the Court finds none. Plaintiffs have had ample opportunity to depose CCS personnel; and Plaintiffs will have the opportunity to present deposition testimony at trial. Finally, Plaintiffs offer no convincing basis for spoliation instructions beyond those already decided.

---

[3] This request was a subject of Plaintiffs' second motion in limine, which was denied by the Court. (Doc. No. 294 at ¶ 2; Doc. No. 327 at p. 1)

Plaintiffs should be awarded reasonable attorneys' fees and costs for work on their second motions for sanctions. FED. R. CIV. P. 37(b)(2)(C). Also, in a companion report and recommendation issued today, this Court notes that Plaintiffs have not been awarded costs for expenses incurred during the clean-up discovery phase. It is recommended that Plaintiffs be awarded $6,063.65 in costs. [4] But for CCS's discovery misconduct, Plaintiffs would not have incurred these costs. See *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186, n.5 (2017).

### B. Third Motion for Sanctions (Doc. No. 285)

In their third motion for sanctions, Plaintiffs seek sanctions based on CCS's failure to turn over Arkansas Department of Correction Operational Policy 111.01,[5] and its failure to produce the CCS human resources policies. (Doc. Nos. 285, 285-1)

Although CCS arguably should have produced the Arkansas Department of Correction Operational Policy 111.01,[6] Plaintiffs could have pursued third-party discovery rather than bringing a motion for sanctions. See FED. R. CIV. P. 45.

---

[4] This amount covers the cancellation fee charged by Plaintiffs' expert when the trial was postponed; the court reporter fees for depositions taken during the clean-up discovery period; and costs for transcriptions for motion and status conference hearings. (See Doc. No. 300-4) Excluded from the total are fees charged by Plaintiffs' nursing expert to review the newly discovered medical records because Plaintiffs would have incurred these costs even if the records had been revealed earlier in the litigation process.

[5] CCS did, however, turn over Arkansas Department of Correction Operational Policy 105.00. (Doc. No. 69 at p. 7; Doc. No. 69-11)

[6] See *Roark v. Credit One Bank, N.A.*, No. 16-CV-173-RHK-FLN, 2016 WL 11606777, at *3 (D. Minn. Dec. 2, 2016) (finding FED. R. CIV. P. 34 encompasses documents which a party has the legal right to obtain on demand), but see *Whatley v. Canadian Pac. Ry. Ltd.*, No. 1:16-CV-74-DMT-CRH, 2019 WL 6972405, at *2 (D.N.D. Dec. 19, 2019)

As for CCS human resources policies, there is no evidence that the policies were purposefully withheld. There is also no indication that Plaintiffs sought to obtain these documents in good faith before filing their motion for sanctions. And notably, Plaintiffs do not seek to compel the documents.

Also, in their third motion for sanctions, Plaintiffs point to Dr. Bazzel's testimony, as a means to speculate that more policies and procedures were not produced. The Court has carefully read the deposition and finds no basis for Plaintiffs' conjecture on this point. Accordingly, Plaintiffs' third motion for sanctions should be denied; they are not entitled to attorneys' fees for bringing the motion.

**V.     Conclusion:**

The Court recommends that Plaintiffs' second motion for sanctions (Doc. No. 263) be GRANTED in part and DENIED in part; Plaintiffs are entitled to attorneys' fees and expenses in bringing their second motion, and expenses incurred during the clean-up discovery period. Plaintiffs' third motion for sanctions (Doc. No. 285) should be DENIED.

DATED this 27th day of January, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

---

(finding party should pursue third-party discovery measures).